# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE NORTH RIVER INSURANCE COMPANY | : | CIVIL ACTION NO.: 3:13-cv-00589 (RNC) |
| | : | |
| v. | : | |
| | : | |
| O&G INDUSTRIES, INC. KEYSTONE CONSTRUCTION AND MAINTENANCE SERVICES, INC. | : | JANUARY 24, 2014 |

**PLAINTIFF'S OBJECTION TO DEFENDANT, O&G INDUSTRIES, INC.'S, MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

The plaintiff, The North River Insurance Company ("North River"), hereby respectfully objects to the defendant, O&G Industries, Inc.'s ("O&G) Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure, dated December 23, 2013 (Doc. Nos. 50 and 54).

**I.   STANDARD FOR MOTION FOR SANCTIONS**

"The standard for triggering an award of fees under Rule 11 is objective reasonableness, such that [a] distinction [is] drawn between a position which is merely losing, and one which is both losing and sanctionable." Lawrence v. Richman Group of Connecticut, LLC, 2006 WL 3841808, *3 (D. Conn.).[1] "[T]o constitute a frivolous legal position for purposes of a Rule 11 sanction, it must be

---

[1] All unreported cases cited in Sections I and II will be provided to the Court under separate cover. Copies of unreported cases cited in Sections III and IV were provided to the Court via a cover letter dated December 6, 2013.

/996082.1

clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify, or reverse the law as it stands." Id. citing Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990). "The test under Rule 11 is objective, and sanctions shall be imposed only when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the paper." Stephens v. TES Franchising, LLC, 2006 WL 1933094, *6 (D. Conn.) citing Oliveri v. Thompson, 803 F.2d. 1265, 1275 (2d Cir. 1986).

"In evaluating a Rule 11 motion, the Court must 'resolve all doubts in favor of the signer.'" Johnson v. Anderson, 2007 WL 735776, *4 (D. Conn.) citing Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir. 1986). Further, the signers "conduct is to be judged as of the time the pleading or other paper is signed." Stephens v. TES Franchising, supra. "[S]anctions may not be imposed unless a particular allegation is utterly lacking in support." Id. Because Rule 11 is a "coercive mechanism…sanctions should be imposed with restraint and discretion." Kennedy v. Chamberland, 2008 WL 474258, at *1 (D. Conn.) quoting Pannonia Farms, Inc. v. U.S.A. Cable, 426 F.3d. 650, 652 (2d Cir. 2005). Further, "[e]ven if the district court concludes that the assertion of a given claim violates Rule 11 . . . the decision whether or not to impose sanctions is a matter for the court's discretion." Id. quoting Perez v. Posse Comitatus, 373 F.3d. 321, 325 (2d Cir. 2004).

## II.   O&G'S ACCUSATION THAT NORTH RIVER HAS COMMITTED A "FRAUD ON THE COURT" IS CONTRADICTED BY O&G'S AND KEYSTONE'S OWN LETTERS AND PLEADINGS.

### A.   Introduction

O&G's Motion for Sanctions is founded upon the outrageous accusation that North River has "committed a fraud on the Court" for alleging that O&G's motive for causing the exhaustion of the ACE American Insurance Company ("ACE") primary policy was to strip Keystone Construction and Maintenance Services, Inc. ("Keystone") of a defense against the remainder of O&G's $44.6 million arbitration claim. As grounds for that accusation, O&G has represented to this Court that on October 28, 2013, in a telephone conversation, O&G's counsel notified counsel for North River that, at or about the time of the ACE settlement (May 25, 2012)[2], O&G and Keystone also settled the remainder of the O&G arbitration claim. O&G Memorandum of Law In Support of Motion for Sanctions ("Motion for Sanctions"), ¶¶ 13, 16. Therefore, O&G argues, it could not have been motivated to strip Keystone of a defense because there was nothing left to defend.

O&G's accusation, however, is contradicted by O&G and Keystone's own letters and pleadings. As more particularly set forth herein, for months following the May 25, 2012 ACE settlement, Keystone's counsel continued to demand that North River settle the remaining portion of the

---

[2]On or about December 16, 2011, O&G commenced an arbitration claim against Keystone seeking over $44.6 million in damages. On or about May 25, 2012, Keystone's primary insurer ACE, settled a portion (a claim for attorneys' fees) of that claim in consideration of its $1 million policy limits. The remainder of O&G's Arbitration Claim was not settled or released in the settlement involving the ACE policy.

O&G Arbitration Claim.  In addition, O&G, in a case before Judge Thompson, *represented in a pleading*, that during June, July and August of 2012, Keystone was still demanding that Everest National Insurance Company ("Everest") negotiate a resolution with O&G.  O&G also alleged that in late August 2012, Keystone's counsel wrote to Everest's counsel "advising that Keystone was in poor financial condition, asking Everest to negotiate a resolution with O&G and advising that if Everest did not, Keystone would settle with O&G and assign its rights against Everest to O&G."  See Affidavit of R. Cornelius Danaher, Jr. ("Danaher Aff.") at ¶ 20 and Exhibit I.  The remainder of the O&G Arbitration Claim could <u>not</u> have been settled in May of 2012 if, in August 2012, Keystone was still demanding that Everest and Keystone negotiate a resolution with O&G.

Neither O&G nor Keystone notified North River that they had settled the remainder of the O&G Arbitration Claim until February 5, 2013, which is also inconsistent with O&G's eleventh hour claim that it settled in May, 2012, eight months earlier.  See Danaher Aff., ¶ 21 and Exhibit J.  Further, both O&G and Keystone have steadfastly refused to provide North River documentation concerning the purported settlement.

As further grounds for its accusation, O&G also has represented that Westchester Surplus Lines provided Keystone a defense under a professional liability policy.  However, throughout this case, Keystone has repeatedly represented to North River that no insurance company provided it a defense to the O&G arbitration claims.  As late as March 11, 2013, (after settlement of the O&G Arbitration Claim), Keystone's counsel wrote to North River's counsel: "[a]s you are aware, the only insurance

carrier which acknowledged any duty to defend Keystone with respect to any of the claims since the

Allied-World CCIP policy was exhausted was ACE...." Danaher Aff., ¶ 25 and Exhibit N.

**B.      Documentary Evidence That O&G And Keystone Settled The Remainder Of The O&G Arbitration Claim Months After The ACE Settlement And That Westchester Surplus Lines Did Not Defend Keystone In the O&G Arbitration Claim.**

On December 20, 2011, Eric Eisenberg of Hinckley, Allen & Snyder LLP, counsel for

Keystone, wrote an email to North River's counsel advising that "O&G Industries, Inc. has made a claim

(copy attached) against Keystone for alleged property damage and associated delay damages resulting

from the February 7, 2010 explosion at the Middletown, CT Kleen Energy plant." This letter demanded

that North River defend and, in the event Keystone was found liable, indemnify Keystone against these

claims. See Danaher Aff., ¶ 9 and Exhibit A.

On February 27, 2012, Eric Eisenberg wrote a letter to North River's counsel stating:

"[t]he arbitration claim by O&G is moving forward... and it is likely that counsel will not be available to

defend Keystone" and that "Keystone is also very concerned that the bodily injury mediation process is

proceeding without the involvement of counsel for Keystone, because Allied World has ceased funding

Keystone's bodily injury defense." (Emphasis added.).  The letter further states that "[i]t is imperative

that a method be found, in the very near future, to fund a defense for Keystone" and that "[t]his situation

is not likely to change in the future." (Emphasis added.)  Eisenberg's letter, dated February 27, 2012,

does not mention or refer to a Westchester Surplus Lines Insurance policy. See Danaher Aff., ¶ 10 and

Exhibit B.

On May 16, 2012, Eric Eisenberg wrote a letter to North River's counsel regarding Keystone's arbitration with O&G.  The letter states that "[i]n the Arbitration, O&G claims that Keystone is responsible for the explosion and seeks damages against Keystone" and that "Keystone demands that North River indemnify it with regard to the Arbitration Claims and participate in settlement discussions with O&G with regard to the Arbitration Claims."  The letter further goes on to state that "<u>Keystone is in poor financial condition</u> and needs to resolve its various liability exposures, including the Arbitration Claims, as soon as possible."  (Emphasis added.)  Eisenberg's letter, dated May 16, 2012, does not mention or refer to a Westchester Surplus Lines policy.  See Danaher Aff., ¶ 11 and Exhibit C.

On May 25, 2012, Keystone, ACE and O&G entered into a partial settlement of the O&G Arbitration Claim wherein ACE paid its $1 million policy limits to satisfy the attorney's fees portion of the claim.  See Danaher Aff., ¶ 12 and Exhibit D.

On June 27, 2012, North River's counsel sent a letter to Eric Eisenberg stating that "[n]either ACE nor Keystone has provided North River information regarding the status of the O&G arbitration.  Please (1) provide us with contact information of the law firm defending Keystone; (2) provide us a summary of what has occurred to date; and (3) provide us with copies of all documentation that has surfaced in the arbitration."  See Danaher Aff., ¶ 13 and Exhibit E.

On August 23, 2012, Eric Eisenberg sent a letter where he informed North River that "Hinckley Allen is the law firm representing Keystone in the O&G arbitration" and that "<u>[t]o date, nothing substantive has happened in the arbitration as we try to reach a settlement with O&G.</u>"

(Emphasis added.). The letter further stated that "<u>Keystone is in poor financial condition</u>, and, in the face of the continuing refusal of North River to honor its coverage obligations, must act to protect its interests and to resolve its various liability exposures, including the Arbitration Claims, as soon as possible." (Emphasis added.) See Danaher Aff., ¶ 14 and Exhibit F.

While O&G has represented to this Court that the remainder of the O&G Arbitration Claim was settled at or about the time of the ACE settlement (May 25, 2012), Keystone's counsel, in his letter, dated August 23, 2012, represented to North River that the arbitration was ongoing and that Keystone was still trying "to reach a settlement with O&G." See Danaher Aff., ¶ 15 and Exhibit F.

On August 31, 2012, North River's counsel wrote to Eric Eisenberg requesting a myriad of documents, including but not limited to "all documents and other information in Keystone's possession concerning the legal and factual basis for O&G's claims and Keystone's defenses." This letter also requests "a status of the O&G arbitration including a summary of what has occurred to date and copies of all documentation that has surfaced in the arbitration." See Danaher Aff., ¶ 16 and Exhibit G.

Keystone did not respond to North River's letter, dated August 31, 2012. See Danaher Aff., ¶ 17.

On November 30, 2012, counsel for North River wrote to Eric Eisenberg stating that he understood that "O&G Industries, Inc. ("O&G") and Keystone Construction and Maintenance Services, Inc. ("Keystone") have entered into a settlement of the claims that O&G made against Keystone in the

arbitration commenced on or about December 16, 2011." The letter requested "copies of all documents evidencing or concerning the settlement, including, without limitation, the settlement agreement; drafts; notes; memoranda; and correspondence (including electronic communications) by and between persons, including attorneys, acting upon O&G's and Keystone's behalf leading up to the settlement." See Danaher Aff., ¶ 18 and Exhibit H.

Keystone did not respond to North River's letter, dated November 30, 2012.  See Danaher Aff., ¶ 19.

On January 8, 2013, O&G filed a Second Amended Complaint in the case <u>O&G Industries, Inc. v. Everest National Insurance Company</u>, Civil Action No. 3:12-cv-01687-AWT.   In its Second Amended Complaint, O&G did not allege that the remainder of the O&G Arbitration Claim was settled at or about the time of the May 25, 2012 ACE settlement.   Rather, its pleading alleges that during June, July and August of 2012, Keystone was still demanding the Everest negotiate a resolution with O&G.

> **PARAGRAPH 42:** "On May 25, 2012, the ACE Policy was exhausted through an agreement between ACE, Keystone and O&G for the ACE Policy limits to be paid to O&G to resolve the Attorneys' Fees Claim. Everest was promptly notified of the exhaustion of the ACE Policy."

*   *   *   *

> **PARAGRAPH 48:** "After Everest's refusal to participate in a pool to settle various lawsuits, Keystone repeatedly informed Everest of its desire that Everest settle O&G's Arbitration claims.  Among other things in that regard, <u>Keystone agreed to attend a meeting with Everest and O&G in late June or early July, 2012 at which an effort was made to settle the O&G</u>

<u>Arbitration claims.</u>  That meeting did not take place due to the purported unavailability of Everest.  <u>Further, Keystone's counsel wrote to Everest's counsel on August 23 and 24, 2012, respectively, advising that Keystone was in poor financial condition, asking Everest to negotiate a resolution with O&G and advising that if Everest did not, Keystone would settle with O&G and assign its rights against Everest to O&G."</u>  (Emphasis added.)

See Danaher Aff., ¶ 20 and Exhibit I.

On February 5, 2013, North River received a letter from Finley Harckham of Anderson Kill, P.C., counsel for O&G, stating that O&G had settled the remainder of its arbitration claim against Keystone.  [This is the settlement that O&G now claims was made at or about the time of the ACE settlement agreement, i.e. May 25, 2012.]  This was the first notice that O&G or Keystone provided North River that the remaining portion of the O&G Arbitration Claim has been settled.  See Danaher Aff., ¶ 21 and Exhibit J.

On February 8, 2013, North River's counsel wrote a letter to Finley Harckham.  In this letter, North River requested, among other documents, "copies of all documents evidencing the settlement between O&G and Keystone."  See Danaher Aff., ¶ 22 and Exhibit K.

On February 12, 2012, Finley Harckham responded to North River's counsel, ignoring his request for the settlement documents, stating "the settlement need be of no concern to North River."  See Danaher Aff., ¶ 23 and Exhibit L.

On February 21, 2012, North River's counsel wrote to Finley Harckham, stating:  "[I]t is difficult to understand why Keystone did not present a defense.  Perhaps it is because Keystone was stripped of defense capability as a result of the settlement and arrangements among O&G, Keystone and

ACE, the result of which was ACE's claim that its coverage is exhausted. We find it interesting that O&G would facilitate the exhaustion of the ACE policy (the only Keystone policy that contains a defense obligation), when it had a multi-million dollar claim against Keystone." O&G never denied or otherwise responded to this statement. Moreover, the letter goes on to state: "Based on limited statements made to us, it is our understanding that O&G made a payment to Keystone as an inducement to enter into the settlement." O&G also never denied or responded to this statement. In this letter, North River's counsel again asked for documents, including but not limited to, "copies of all communications involving ACE, O&G and Keystone concerning the O&G arbitration claim including ACE's coverage position." See Danaher Aff., ¶ 24 and Exhibit M.

On March 11, 2013, Eric Eisenberg wrote to North River's counsel stating: "As you know, as a result of the February 7, 2010 explosion at Middletown, Connecticut (the "Explosion"), Keystone has been faced with myriad person injury and property damage claims and has seen its operating revenues dramatically decreased. As you are also aware, the only insurance carrier which acknowledged any duty to defend Keystone with respect to any of the claims since the Allied-World CCIP policy was exhausted was ACE…" (Emphasis added.) Keystone also refused North River's request for a copy of the settlement document between O&G and Keystone. See Danaher Aff., ¶ 25 and Exhibit N.

On April 3, 2013, Sheila Burke, CEO of Keystone, wrote to North River's counsel regarding a recently filed bodily injury claim arising out of the Kleen Energy explosion. In that letter,

Ms. Burke affirmatively represented that the insurance available to <u>defend</u> Keystone "has been

exhausted" and that "Keystone does not have the financial means to defend the claims".  She stated that

"<u>[t]he insurance available to defend Keystone against the Claims under the CCIP program in place for</u>

<u>the Kleen Energy Project, as well as the insurance provided to Keystone by an ACE general liability</u>

<u>policy and an Everest National Insurance Policy has been exhausted.  Keystone does not have the</u>

<u>financial means to defend the Claims.</u>  Keystone hereby calls upon North River to indemnify and defend

Keystone with regard to the Claims."  (Emphasis added.)  Ms. Burke's letter does not mention or refer to

Westchester Surplus Lines.  See Danaher Aff., ¶ 26 and Exhibit O.

On October 28, 2013, after North River had filed its First Amended Complaint for

Declaratory Judgment [Doc. No. 23], counsel for O&G stated to counsel for North River that O&G and

Keystone settled the remainder of the O&G Arbitration Claim at or about the time of the ACE settlement

agreement.  This is the first time that O&G (or Keystone) ever made such a claim.  See Danaher Aff.,

¶ 27.

On October 29, 2013, counsel for North River wrote to Finley Harckham requesting a

copy of the settlement agreement purportedly made during the first week of June 2012 between O&G

and Keystone.  See Danaher Aff., ¶ 28 and Exhibit P.

Finley Harckham never responded to North River's request for the purported settlement

agreement made in the letter dated October 29, 2013.  See Danaher Aff., ¶ 29.

On October 30, 2013, North River's counsel wrote to Joel Lewin of Hinckley Allen, counsel for Keystone, and requested the letter agreement purportedly made during the first week of June 2012 between O&G and Keystone.  See Danaher Aff., ¶ 30 and Exhibit Q.

Joel Lewin never responded to North River's request for the purported settlement agreement between O&G and Keystone.  See Danaher Aff., ¶ 31.[3]

---

[3]The affidavits that O&G has submitted in support of its Motion do not help its cause.

First, the Affidavit of Sheila Burke, Keystone's President, contradicts statements previously made by her and Keystone's counsel.  For example, in her Affidavit dated December 13, 2013, she states:  "A few days after the settlement with ACE and O&G was executed, Keystone and O&G executed a settlement agreement which resolved an arbitration commenced by O&G which asserted claims relating to the February 7, 2010 incident."  However, Keystone's counsel, months after the ACE settlement, was still demanding that Everest and North River resolve arbitration claims that O&G had made against it.  See Danaher Aff., ¶ 14 and Exhibit F.  In her Affidavit dated December 13, 2013, she also states that "[t]he defense counsel fees incurred by Keystone in the Underlying Actions are being covered by Westchester Surplus Lines Company. . . ." but on March 11, 2013 (after the O&G Arbitration Claim had been settled) Keystone's counsel was telling North River that "the only insurance carrier which acknowledged any duty to defend Keystone with respect to any of the claims since the Allied-World CCIP policy was exhausted was ACE. . . ."  See Danaher Aff., ¶ 25 and Exhibit N.  On April 3, 2013, Sheila Burke, herself, wrote to North River's counsel that "[t]he insurance available to defend Keystone against the Claims under the CCIP program in place for the Kleen Energy Project, as well as the insurance provided to Keystone by an ACE general liability policy and an Everest National Insurance Policy has been exhausted.  Keystone does not have the financial means to defend the Claims."  Danaher Aff., ¶ 26 and Exhibit O.  Ms. Burke never mentioned Westchester Surplus Lines to North River until December 23, 2013 when O&G filed its Motion for Sanctions, including the Burke Affidavit.  The earlier and repeated contemporaneous representations made by Ms. Burke and her counsel are very much at odds with the statements made in her sworn affidavit.

Second, the Finley Harckham Affidavit filed December 23, 2013 [Doc. 52] merely attaches a copy of the Westchester Surplus Lines insurance policy, but is strangely silent as to

**C.**   **North River Has A Good Faith Basis To Assert That No Insurer Defended Keystone Against The O&G Arbitration Claim And That O&G And Keystone Did Not Settle The Remainder Of The O&G Arbitration Claim At Or About The Time Of The ACE Settlement Agreement.**

O&G's accusation that North River's allegation that O&G's intent in settling with ACE was to deprive Keystone of defense coverage is "patently false" and that North River "knew them to be false when first asserted in the Amended Complaint" flies in the face of O&G's and Keystone's own writings.

O&G's new version of the facts, revealed only after North River filed its Amended Complaint, contradicts all the information (to the extent that either O&G or Keystone were forthcoming) previously provided to North River.  Keystone never stated to North River that Westchester Surplus Lines was providing a defense to Keystone in the O&G Arbitration Action.  In fact, Keystone still has not asserted as much.  The fact is that Keystone's counsel represented to North River that "[a]s you are well aware, the only insurance carrier which acknowledged any duty to defend Keystone with respect to any of the claims since the Allied-World CCIP policy was exhausted was ACE. . . ." Danaher Aff., ¶ 25

---

when Westchester Surplus Lines acknowledged a duty to defend Keystone or whether it defended Keystone against the O&G Arbitration Claims.

Third, Kenneth Merz, the Secretary of O&G, submitted an affidavit.  Merz did <u>not</u> aver that the O&G Arbitration Claim was settled at or about the time of the ACE Settlement nor refer to a Westchester Surplus Lines policy.  The averments set forth in the Merz Affidavit are not material to the outcome of the Motion for Sanctions.

Fourth, the Dennis Artese Declaration merely authenticates two documents.

and Exhibit N. And, Keystone's CEO, Sheila Burke, represented to North River that "[t]he insurance available to defend Keystone against the Claims under the CCIP program in place for the Kleen Energy Project, as well as the insurance provided to Keystone by an ACE general liability policy and an Everest National Insurance Policy has been exhausted. Keystone does not have the financial means to defend the Claims." Danaher Aff., ¶ 26 and Exhibit O. The evidence in this case is that O&G was successful in its efforts to strip Keystone of a defense against its $44.6 million arbitration claim.

Secondly, O&G's new version of the facts, (that the remainder of the O&G arbitration claim was resolved at or about the time of the May 25, 2012 ACE settlement agreement) directly contradicts Keystone's representations to Everest and to North River that in late August 2012 the O&G Arbitration matter had still <u>not</u> been resolved. And, most disturbing, O&G's new version of the facts contradicts its pleading in the matter captioned <u>O&G Industries, Inc. v. Everest National Insurance Company</u>, Civil Action No. 3:12-cv-01687-AWT where it alleged that in June, July and August of 2012 Keystone was demanding that Everest negotiate a resolution of O&G's Arbitration Claims, or otherwise Keystone would settle with O&G and assign its rights against Everest to O&G. Danaher Aff., ¶ 26 and Exhibit I. O&G seems to have one set of facts for Judge Thompson's courtroom and another for Judge Chatigny's.

There is no doubt that North River has a good faith basis to assert that <u>no insurance company defended Keystone against the O&G Arbitration Claim,</u> and that <u>O&G and Keystone did not settle the remainder of the O&G Arbitration Claim at or about the time of the ACE Settlement</u>

- 14 -

Agreement.  O&G successfully made it possible for ACE to exhaust its $1 million policy limits on an undefended and unproven claim[4] and caused Keystone to release ACE from its defense obligations against the remainder of the O&G Arbitration Claim.

### III.   NORTH RIVER'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS IS VALID AND NOT "BASELESS AND FRIVOLOUS".[5]

In their Motion for Sanctions, O&G states three reasons why North River's Amended Complaint fails to state an actionable claim for tortious interference with contractual relations.  See Motion for Sanctions, ¶ 40.  Each argument will be addressed below.

#### A.   North River Has Plead Facts That O&G Interfered With Keystone's Second Level Excess Policy With North River.

First, O&G alleges that North River does not allege any facts that support the theory that O&G interfered with Keystone's second-level excess policy with North River.  See Motion for Sanctions, ¶ 41.  That is, of course, not true.  North River has plead the following:

> 114.   Upon information and belief, O&G withheld monies due Keystone for its work on the Kleen Energy site and maliciously conditioned payment of monies due Keystone unless Keystone would participate in causing ACE to exhaust its policy limits by paying $1 million in partial settlement of O&G's arbitration claim.

---

[4]Keystone performed no discovery against the O&G Arbitration Claim.  Amended Complaint, ¶ 121.

[5]North River hereby incorporates the legal arguments and authorities discussed in its Memorandum of Law in Opposition to O&G Industries, Inc.'s Motion to Dismiss, filed December 6, 2013.  [Doc. No. 49.]

\*   \*   \*   \*

117.    O&G intentionally and improperly interfered with the Keystone's performance of its insurance contract with North River by conditioning payment of monies due Keystone for work on the Kleen Energy project with Keystone's participation in a partial settlement agreement that resulted in purported exhaustion of the ACE primary policy over the objection of Everest and North River.

118.    By conditioning the payment of monies due Keystone on its participation in the partial settlement of the O&G arbitration claim and exhaustion of the ACE policy, O&G intimidated Keystone into breaching its contractual obligation to obtain the written consent of Everest and North River and into breaching its obligation to maintain Underlying Insurance.

O&G argues that "North River's theory of wrongdoing is premised on the underlying assumption that O&G directed and controlled ACE's decision to settle the O&G Arbitration Claims and that the settlement did not represent a arms-length negotiation on the merits." See Motion for Sanctions, ¶ 41. This is not true. North River alleges that O&G caused <u>Keystone</u> to breach its contract with North River. North River has no contractual relationship with ACE and does not allege that O&G interfered with contractual relations between ACE and North River or Everest and North River. There is no requirement that North River must show that O&G controlled ACE or Everest.

While it is difficult to understand, exactly, the point that O&G is attempting to make, one thing is clear: ACE's payment of its policy limits in partial payment of the O&G Arbitration Claim did

not terminate its duty to defend.  <u>Aetna Life & Casualty Co. v. Gentile</u>, 1995 WL 779102 (Conn.

Super.).  ACE's defense obligation terminated only because Keystone affirmatively released ACE

through its participation in the ACE Settlement Agreement.[6]

Any attempt by ACE to extinguish its policy and/or terminate its duty to defend by means

of making, unilaterally, a $1 million partial settlement of the O&G's $44.6 million Arbitration Claim

clearly would have been a breach of ACE's duty of good faith and fair dealing.

> The relationship between insurer and insured is extremely
> complex in dealing with incidents involving multi-
> claimants wherein the total amount of the claims asserted
> have the prospect of exceeding the policy limits.  It may be
> argued, from a simplistic standpoint, that the mere payment
> of the policy limits, in whatever fashion  and in whatever
> amount the insurer may choose, in accordance with its sole
> discretion under the terms of the policy, satisfies the
> requirements of the policy.  When, however, it is
> understood that the exhaustion of the policy exposes the
> insured to the financial jeopardy of payment of any excess
> sums from the insured's own funds, and bearing in mind
> the implications of unsatisfied judgments, the relationship
> between insurer and insured assumes a different
> complexion.

---

[6]Keystone's highly unorthodox participation in the ACE Settlement Agreement,
particularly its release to ACE, evidences the severity of O&G's intimidation and control over
Keystone.  The partial release of a $1 million claim for attorneys fees out of ACE's $44.6 million
claim was of no benefit to Keystone.  And, for ACE's payment of $1 million for a partial
settlement, Keystone gave up a most valuable asset:  ACE's defense obligation.  The only
explanation for this otherwise inexplicable scenario is O&G's intimidation of Keystone by its
conditioning payment of $1.5 million to Keystone upon Keystone's breach of the North River
policy by participation in the ACE Settlement Agreement, including the termination of ACE's
duty to defend.

Appended to every contract is the implied covenant of
'good faith and fair dealing.'

Aetna Life & Casualty Co. v. Gentile, 1995 WL 779102, at *5 (Conn.  Super.).  "[A]ny payment of the

policy limits which does not release the insured from a pending claim . . . even if sufficient to terminate

the duty to defend under the wording of the policy involved, raises serious questions as to whether the

insurer has discharged its policy obligations in good faith."  H.S. Stanley, Jr.  v.  Trinchard, 500 F.3d

411, 429 (5th Cir.  2007), quoting Pareti v.  Sentry Indemnity Co., 536 So.2d 417, 424 (La.  1988).

The purpose for this rule is to protect insureds from primary insurers who tender their

policy limits or pay a portion of a claim in order to avoid their defense obligations.  "A primary carrier

cannot simply tender its policy limits to an excess carrier and thereby wash its hands of its duty to defend

their common insured.  A primary carrier cannot, in other words, 'dump its limits' or 'pay and walk'".

Douglas R. Richmond, Appleman on Insurance Law and Practice, § 24.04[2].

If the rule were otherwise, "an insurer would be free, regardless of the merits of a

personal injury claim to tender the coverage limits to the claimant and decline to defend further

whenever the insurer anticipates that the cost of providing a defense would exceed the amount of

coverage.  The duty to defend generally relied upon by insured[s] . . . would, thus, be significantly

nullified in a large number of cases."  Aetna Casualty Surety Co. v. Sullivan, 33 Mass. App. Ct. 154,

158, 597 N.E.2d 62, 65 (1992).

It clearly would have been a breach of ACE's duty of good faith and fair dealing to exhaust, unilaterally, its limits and terminate its duty to defend by paying its $1 million policy limits in partial satisfaction of a claim in excess of $44.6 million.

It is obvious that the parties to the ACE Settlement Agreement understood that ACE's unilateral payment of its policy limits would not exhaust its limits or terminate its duty to defend because otherwise it would not have been necessary for Keystone to be a party to the agreement and to affirmatively release ACE from further obligations under the policy.  Consequently, there is no requirement that North River must show that O&G controlled ACE.

**B.**     **North River Has Plead That O&G Acted With An Improper Motive And That O&G Used Improper Means To Induce Keystone To Breach The North River Policy.**

In its Motion for Sanctions, O&G also argues that North River does not allege that O&G's actions were "motivated by an intent to harm North River, but rather asserts that it was intended to harm Keystone."  See Motion for Sanctions, ¶ 42.  This is not true.  In fact, North River alleges that O&G wrongfully and maliciously withheld payment of monies due Keystone in order to force Keystone to enter into settlement of the O&G Arbitration Claims with the purpose of exhausting the limits of Keystone's primary insurance policy.  Amended Complaint, ¶ 114.  North River further alleged that this action by O&G intentionally and improperly interfered with Keystone's performance of its insurance contract with North River.

- 19 -

O&G's improper motive, in causing the improper exhaustion of the ACE primary policy on an undefended and unproven claim, was to leave Keystone without resources to defend itself against the remainder of the O&G Arbitration Claim. Amended Complaint, ¶¶ 119-121. The exhaustion of the ACE primary policy, including the extinguishment of ACE's duty to defend, interfered with North River's business relationship with Keystone. Id., ¶ 120.

Further, North River has clearly plead sufficient facts that O&G interfered by means of intimidation/coercion. O&G knew that Keystone was financially distressed and that its only means of defending itself against the O&G Arbitration Claim was by means of ACE's defense obligation. Amended Complaint, ¶ 119. Therefore, O&G conditioned payment of monies due Keystone upon Keystone's participation in a partial settlement agreement that resulted in the purported exhaustion of the ACE primary policy over the objection of North River. Amended Complaint, ¶ 117. By conditioning of the payment upon Keystone's participation in the ACE Settlement Agreement, O&G intimidated Keystone into breaching its contractual obligations to North River. Id., ¶ 118. O&G's motive in causing Keystone's participation in the ACE Settlement Agreement was to leave Keystone defenseless against the remainder of the O&G Arbitration Claim. Id., ¶ 119. Furthermore, the severity of O&G's intimidation and coercion over Keystone is apparent from Keystone's highly unorthodox participation in the ACE Settlement Agreement, including its affirmative release of ACE. See footnote 6.

**C.**   **North River Has Plead That O&G's Tortious Conduct Has Caused It Concrete Harm.**

Lastly, O&G argues that North River fails to state a claim because it has not alleged an "actual and concrete" injury that is not "remote and speculative." See Motion for Sanctions, ¶ 43. O&G argues that the "$11 million exhaustion of underlying policy limits of the ACE and Everest policies" is "not a loss suffered by North River." Id. O&G's argument is easily refuted.

North River's injury is not remote. As a consequence of O&G's tortious conduct, Keystone claims that North River's second layer has attached. Paragraph 90 of the Amended Complaint states: "Keystone has claimed that all underlying insurance is exhausted and has demanded that North River indemnify Keystone against the claims made in the remaining bodily injury and property damage cases arising out of the February 7, 2010 gas explosion." Indeed, "[n]umerous courts have concluded that, for a declaratory judgment coverage action involving an excess policy to be ripe, it must be practically or reasonably likely that the insured's potential liability will reach into the excess coverage; absolute proof that the policies will be triggered is not required." Liberty Mutual Ins. Co. v. Lone Star Industries, Inc., 290 Conn. 767, 814 (2009). North River's claim, therefore, is ripe and its loss is not remote because the improper exhaustion of underlying insurance has allegedly caused its second layer excess policy to attach.

In the circumstances here, the improper exhaustion of $11 million of underlying insurance (on a claim that was undefended and unproven), purportedly causing the North River second layer excess policy to attach, states a claim upon which relief can be granted. Id.

Excess insurers, such as North River, are harmed when underlying insurance is squandered on undefended/unproven claims. "An excess liability policy pays benefits only after the limits of the primary or underlying insurance policy have been exhausted." 1 New Appleman on Insurance Law Library Edition, § 1.06[7]; see also 1 Couch on Insurance § 1:4 (defining "excess insurer" as "an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable 'primary' insurance."). "Excess liability policies assume the less frequent risk that an insured will be liable for a judgment that exceeds the primary policy's limits. Accordingly, excess liability policies carry lower premiums that reflect the lesser magnitude of this risk." Apodaca v. Allstate Ins. Co., 255 P.3d. 1099, 1103 (Colo. 2011) (en banc); see also Kajima Construction Services, Inc. v. St. Paul Fire & Marine Ins. Co., 227 Ill.2d. 102, 114 (2007) (in contrast to primary insurance, excess insurance premiums are lower precisely because this secondary coverage is not to be collected unless and until the limits of the insured's primary coverage are exhausted); Virginia Surety Ins. Co. v. RSUI Indemnity Co., 2009 WL 4282198 (D. Ariz.) ("The remote position of the excess [insurer] greatly reduces its chance of exposure to a loss, and therefore, an excess [insurer] charges lower premiums.") (quoting National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of North America, 955 S.W.2d. 120, 138 (Exhibit Ct. App. 1997.)). The squandering of underlying insurance on undefended and unproven claims causes the excess carrier's policy to attach sooner than it should and, therefore, deprives the excess carrier of the benefit of its bargain. Consequently the excess carrier relies upon the underlying insurance to be exhausted in good faith. Cf., State National Insurance Co. v. County of Camden, 2009

WL 4895245, at *3 (D.N.J.) (excess insurers rely upon the proper, good faith exhaustion of underlying insurance.).

North River respectfully submits that it has plead a valid cause of action for interference with contractual/business relations against O&G. Rule 11 sanctions are inappropriate.

## IV.   NORTH RIVER'S CUTPA CLAIM AGAINST O&G IS VALID AND NOT "BASELESS AND FRIVOLOUS".

O&G also argues in its Motion for Sanctions that North River's CUTPA claim is "baseless and frivolous". See Motion for Sanctions, ¶¶ 44-51. O&G asserts a variety of arguments in support of this claim. These arguments will be addressed in turn below.

### A.   North River Has Standing To Assert CUTPA Claim.

#### 1.   North River Has Standing To Assert A CUTPA Claim Because O&G Interjected Itself Into A Contractual Relationship Between North River And Its Policyholder, Keystone.

O&G has argued that North River lacks standing to assert a CUTPA claim against O&G because North River and O&G had no business relationship. See Motion for Sanctions, ¶ 45. However, a direct commercial relationship is not required for standing purposes. In Golden v. Hamer, 2009 WL 3086417 (Conn. Super.) the Court stated: "[I]n describing the business relations necessary for a plaintiff to have standing to assert a CUTPA claim, the cases indicate that a business person must have a direct commercial relationship with the defendant, *or some other relationship with the defendant in a commercial marketplace, so that a nexus exists between this relationship and an ascertainable loss caused by the defendant's unfair or deceptive practices.*" Id. at *8. (Emphasis added).

In the circumstances here, O&G interjected itself into the commercial relationship between North River and its policyholder, Keystone, by withholding monies due Keystone under a subcontract unless Keystone would breach its contractual duty to cooperate in the defense of any claim or suit and to obtain North River's consent to settle.  O&G's conduct stripped Keystone of any ability to defend itself against the $44.6 million arbitration claim, setting up the $37 million settlement which included an assignment of Keystone's contract rights under the Everest policy and exhaustion of the Everest policy.  Therefore, through O&G's wrongful interjection into the contractual relationship between North River and Keystone, North River has "some other relationship with the defendant in a commercial marketplace, so that a nexus exists between this relationship and an ascertainable loss caused by the defendant's unfair or deceptive practices." Id.

Numerous Connecticut cases have found that interference with contractual or business relations is a basis for CUTPA liability, e.g., Reyes v. Chetta, 143 Conn. App. 758 (2013); Renew Windows & Siding, LLC v. Anderson, 2013 WL 1406232, at *4 (Conn. Super.); Direct Mail Jobs, LLC v. Hughes, 2011 WL 3672086, at *6 (Conn. Super.), indicating that such tort activity creates "a relationship [between plaintiff and defendant] in a commercial marketplace, so that a nexus exists between his relationship and an ascertainable loss caused by the defendant's unfair or deceptive practices." Golden v. Hamer, supra, at *8.

## 2. The Harm Suffered By North River, The Loss Of $11 Million Of Underlying Insurance And Extinguishment Of ACE's Duty To Defend, Is Ascertainable And Not Remote.

O&G argues that North River lacks standing to assert a CUTPA claim because it has not alleged a direct injury caused by O&G's conduct and because the injury claimed (improper exhaustion of underlying insurance) is too remote. See Motion for Sanctions, ¶ 45. O&G's argument is not valid.

In fact, the insured, Keystone, claims that the $11 million of underlying insurance has been exhausted and that North River's second layer excess policy has now attached. Paragraph 90 of the Amended Complaint states: "Keystone has claimed that all underlying insurance is exhausted and has demanded that North River indemnify Keystone against the claims made in the remaining bodily injury and property damage cases arising out of the February 7, 2010 gas explosion." Indeed, "[n]umerous courts have concluded that, for a declaratory judgment coverage action involving an excess policy to be ripe, it must be practically or reasonably likely that the insured's potential liability will reach into the excess coverage; absolute proof that the policies will be triggered is not required." Liberty Mutual Ins. Co. v. Lone Star Industries, Inc., 290 Conn. 767, 814 (2009). North River's claim, therefore, is ripe and its loss is not remote because the improper exhaustion of underlying insurance has allegedly caused its second layer excess policy to attach.

To prevail on a claim under CUTPA, a plaintiff must demonstrate that she suffered "ascertainable loss of money or property, real or personal" as a result of the conduct prohibited by the Act. Conn. Gen. Stat. § 42-110g(a). See also Hinchliffe v. American Motors Corp., 184 Conn. 607, 615 (1981) (The ascertainable loss requirement is a threshold barrier which limits the class of persons who

may bring a CUTPA action seeking either actual damages or equitable relief.).[7]

North River's loss of $11 million of underlying insurance is an "ascertainable loss." In Hinchliffe v. American Motors Corp., 184 Conn. 607, 612-13 (1981), our Supreme Court held that a plaintiff is not required "to prove a specific amount of actual damages in order to make out a prima facie case" under CUTPA. "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . ." Id., 613. "The loss of a contract is an ascertainable loss." Johnson Electric Co. v. Salce Contracting Associates, Inc., 72 Conn. App. 342, 355 cert. denied 262 Conn. 922 (2002).

Our Supreme Court's most recent articulation concerning "ascertainable loss" is set forth in Marinos v. Poirot, 308 Conn. 706 (2013):

> [A]s we explained in Hinchliffe, 'damage . . . is only a species of loss'; (internal quotation marks omitted). Id. at 613, 440 A.2d 810; hence '[t]he term 'loss' necessarily encompasses a broader meaning than the term 'damage'." Id. Accordingly, this court previously has concluded that, for purposes of § 42-110g, an ascertainable loss 'is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the actual loss.'

---

[7]One may seek equitable relief in a CUTPA action, as North River has done here. General Statutes, § 42-110g(a) and (d); Associated Investment Company Limited Partnership v. Williams Associates IV, 230 Conn. 148, 158 (1994).

> . . . . Service Road Corp. v. Quinn, 241 Conn. 630, 638-39,
> 698 A.2d 258 (1997).

Id., 713-14.  (Emphasis in original.)

In the circumstances here, the improper exhaustion of $11 million of underlying insurance (on a claim that was undefended and unproven), purportedly causing the North River second layer excess policy to attach, constitutes "ascertainable loss".

Excess insurers, such as North River, are harmed when underlying insurance is squandered on undefended/unproven claims. "An excess liability policy pays benefits only after the limits of the primary or underlying insurance policy have been exhausted." 1 New Appleman on Insurance Law Library Edition, § 1.06[7]; see also 1 Couch on Insurance § 1:4 (defining "excess insurer" as "an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable 'primary' insurance."). "Excess liability policies assume the less frequent risk that an insured will be liable for a judgment that exceeds the primary policy's limits. Accordingly, excess liability policies carry lower premiums that reflect the lesser magnitude of this risk." Apodaca v. Allstate Ins. Co., 255 P.3d. 1099, 1103 (Colo. 2011) (en banc); see also Kajima Construction Services, Inc. v. St. Paul Fire & Marine Ins. Co., 227 Ill.2d. 102, 114 (2007) (in contrast to primary insurance, excess insurance premiums are lower precisely because this secondary coverage is not to be collected unless and until the limits of the insured's primary coverage are exhausted); Virginia Surety Ins. Co. v. RSUI Indemnity Co., 2009 WL 4282198 (D. Ariz.) ("The remote position of the excess [insurer] greatly reduces its chance of exposure to a loss, and therefore, an excess [insurer] charges lower premiums.")

(quoting <u>National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of North America</u>, 955 S.W.2d 120,

138 (Exhibit Ct. App. 1997.)).  The squandering of underlying insurance on undefended and unproven

claims causes the excess carriers policy to attach sooner than it should and, therefore, deprives the excess

carrier of the benefit of its bargain.  Consequently the excess carrier relies upon the underlying insurance

to be exhausted in good faith.  <u>Cf.</u>, <u>State National Insurance Co. v. County of Camden</u>, 2009

WL 4895245, at *3 (D.N.J.) (excess insurers rely upon the proper, good faith exhaustion of underlying

insurance.).

**B.**     <u>**North River Has Made Fact-Specific Allegations Of O&G's Unfair Or Deceptive Acts Or Practices – Specifically, Interfering With North River's Contractual/Business Relationship With Its Policyholder, Keystone.**</u>

     **1.**     <u>**North River's Interference With Contractual Relations Claim Is Valid**</u>.

O&G argues that North River's CUTPA claim fails because it is based on the tortious

interference claim.  See Motion for Sanctions, ¶ 47.  North River has already addressed the validity of its

interference with contractual relations claim and incorporates that argument by reference.

In addition, the proof required for the two claims differ and dismissal of an interference

with contractual relations claim does not necessarily result in a dismissal of a CUTPA claim based on

the same set of facts.  See <u>Associated Investment Co. Limited Partnership v.  Williams Associates IV</u>,

230 Conn.  148, 158 (1994) ("unlike tort claims for interference with business expectations, which

requires proof of malicious or deliberate interference with competitor's business expectations, CUTPA

liability may be based solely on proof of unfair or deceptive acts.")

2.     <u>O&G's Interference With The Contractual/Business Relations Of North River And Its Policyholder Constitutes An Unfair Or Deceptive Act Or Practice.</u>

O&G argues that North River has failed to allege that O&G's conduct constituted unfair or deceptive practices.  See Motion for Sanctions, ¶ 48.  That argument is without merit.  North River has pleaded, inter alia:

148.     O&G has committed unfair or deceptive acts or practices by conditioning the payment of monies due Keystone for work on the Kleen Energy project in exchange for Keystone's participation in the exhaustion of the ACE primary policy over the objection of Everest and North River.

149.     Upon information and belief, by conditioning the payment of monies due Keystone on its participation in the partial settlement of the O&G Arbitration Claim and exhaustion of the ACE primary policy, O&G intimidated Keystone into breaching its contractual obligation to obtain the written consent of Everest and North River and into breaching its obligation to maintain Underlying Insurance.

150.     Upon information and belief, O&G's motive in causing Keystone's participation in the exhaustion of the ACE primary policy was to leave Keystone without resources to defend itself against the remainder of the O&G Arbitration Claim.

151.     As a result of Keystone's participation in the ACE Settlement Agreement, Keystone was unable to defend itself against the remainder of the O&G Arbitration Claim and it settled the O&G Arbitration Claim by admitting liability in excess of $37 million and assigned its rights under the Everest $10 million first layer excess policy.

         *     *     *     *     *

154.    O&G's foregoing actions are unfair or deceptive acts or
practices in violation of Conn. Gen. Stat. § 42-110b.

Amended Complaint.

The above paragraphs reveal that North River relies upon the same factual predicate for

both its interference with contractual relations count and the CUTPA count. A claim for interference

with the contractual or business relations constitutes an unfair or deceptive act or practice under

CUTPA.  See, e.g., Reyes v. Chetta, 143 Conn. App. 758 (2013) (affirming trial court's finding of a

violation of CUTPA based on the facts underlying plaintiff's claim of tortious interference with a

business relationship or expectancy.); Renew Windows & Siding, LLC v. Anderson, 2013 WL 1406232,

at *4 (Conn. Super.) (holding that the evidence supporting proof of tortious inference with contractual

and business relations also supported proof of a violation of CUTPA); Direct Mail Jobs, LLC v. Hughes,

2011 WL 3672086, at *6 (Conn. Super.) ("The same evidence that supports proof of tortious

interference of the defendants with . . . contractual and business relations can support proof of a violation

of CUTPA.").

In fact, Connecticut courts have held that it would be hard to conceive of a case where a

tortious interference claim was proven but a CUTPA claim was not.  See Sportsman's Boating Corp. v.

Hensley, 192 Conn. 747, 756-57 (1984) ("Provided a plaintiff shows that his or her claim is cloaked with

the necessary public interest, it is difficult to conceive of a situation where tortious interference would be

found but a CUTPA violation would not."); see also Precision Computer Services, Inc. v. Zones, 2013

WL 1867052, at *9 (Conn. Super.) ("It is difficult to conceive of a situation where tortious interference

would be found but a CUTPA violation would not.").

As noted above, North River has adequately alleged that O&G interfered with the contractual relations between North River and Keystone. Connecticut case law is clear: interference with contractual and business relations is an appropriate basis for a CUTPA claim.

### 3. North River Has Plead That O&G's Wrongful Acts Were Performed In The Conduct Of Its Trade Or Commerce.

O&G argues that North River's CUTPA claim is deficient because it fails to plead that O&G's wrongful acts were performed in the conduct of any trade or commerce, and that the settlement of insurance-related construction litigation is not part of O&G's regular trade or commerce. See Motion for Sanctions, ¶¶ 49-50. The problem with O&G's argument is that it is in fact in the business of settling claims related to its construction activities.

First, North River has plead that O&G's wrongful conduct was performed in the conduct of its trade or commerce. North River's Amended Complaint reads:

144. O&G's primary trade or business includes commercial transaction and activities that it engages in on a regular basis.

145. O&G engages in risk management activities, including the procurement of insurance, the requirement of certain insurance coverages for its subcontractors, and participation in the defense and/or adjustment of insurance-related claims on a regular basis as part of its primary trade or business.

"To state a claim under CUTPA, the plaintiff must allege that the actions of the defendant were performed in the conduct of trade or commerce." (Internal quotation marks omitted.) Muniz v. Kravis, 59 Conn. App. 704, 711 (2000); General Statutes § 42-110b.

"The question of whether a business transaction by a commercial entity must be in the conduct of that entity's main business to be in the conduct of trade or commerce for purposes of CUTPA has not been addressed by an appellate court in Connecticut." State v. Acordia, Inc., 2013 WL 4419116, at *9 n.7 (Conn.) (quoting R. Langer, et al, 12 Connecticut Practice Series: Unfair Trade Practices (2003) § 3.2, p. 63.). In Acordia, our Supreme Court declined to decide the issue. Id. at *9, n. 7. However, there is nothing in the language of CUTPA to suggest any limitation on "the conduct of trade or commerce."

The improper exhaustion of $11 million of underlying insurance arose out of an activity that O&G engages in on a regular basis to carry out its primary trade or commerce. Amended Complaint, ¶¶ 144-147. In Petra Construction Co. v. Sacred Heart University, 2011 WL 2536196 (Conn. Super.), the Court held that an entity's trade or commerce under CUTPA includes commercial transactions that it engages in on a regular basis to carry out its primary trade or commerce. The defendant, a university, had moved to strike the plaintiff construction company's CUTPA count because the university's consumption of construction services "is clearly incidental to the defendant's primary trade or commerce of education." Id., *1. However, the plaintiff, in its complaint, clearly alleged that the consumption of construction services (construction and maintenance of campus buildings) falls

within the university's primary trade or business.  Therefore, the Court denied the university's motion to

strike, holding that "the plaintiff has sufficiently alleged that the subject conduct falls within the

defendant's primary trade or commerce." Id., *2.  See also <u>Tzovolos v. Wiseman</u>, 51 Conn. Supp. 532

(2007) (Cosgrove, J.) (Defendants claimed that harm did not arise out of their primary business, i.e.,

construction and real estate development.  The court found, however, that "a part of most businesses'

commerce is the borrowing or providing of capital, the giving or taking of security interests and dealing

honestly and in a nonpreferential manner to creditors of an insolvent entity.  These acts are within the

primary scope of business and, therefore, are subject to CUTPA.").  O&G engages in risk management

activities, including the procurement of insurance and participation in the defense and/or adjustment of

insurance-related claims on a regular basis as part of its primary trade or business.  Amended Complaint,

¶ 145.

      Further, this issue was addressed in <u>Passaro-Henry v. Allstate Ins. Co.</u>, 2010 WL 5174405

(D. Conn. 2010) (Hall, J.), where the plaintiff claimed that Allstate violated CUTPA by filing a pattern

of frivolous lawsuits in order to dissuade healthcare professionals from submitting claims.  Allstate

argued that a CUTPA violation may not be alleged for activities that are incidental to its primary trade or

commerce and because Allstate "is not engaged in the business of interfering with medical practices or

practitioners, or filing frivolous lawsuits." Id., *9.  Judge Hall rejected Allstate's argument:

> While Connecticut courts have dismissed CUTPA claims
> on this basis where the allegations raise an isolated issue
> that is clearly distinct from the defendant's primary line of
> business, they have not done so when the allegations assert

> that the conduct bears an adequate connection to that primary trade. [Citing <u>Osberg v. Yale University</u>, 2009 WL 659072, at *6 (Conn. Super.) and <u>Michael J. Hamm, III Property v. Laidlaw Transit, Inc.</u>, 2008 WL 4150199, at *9 (Conn. Super.)]. In [these] cases, although the conduct at issues can be described in a way that puts it outside the defendant's primary trade, strictly construed, the conduct is still linked to that trade, and the allegations still implicate the manner in which the defendant carriers out that primary trade.

<u>Id</u>. Consequently, the Court held:

> In applying the holding of <u>McCann</u> to CUTPA claims arising out of litigation activity, it is more consistent with prior caselaw and more reasonable to ask whether the subject matter of the underlying litigation activity is merely incidental to the defendant's primary trade . . . On this approach, litigation may be adequately related to one's primary trade to satisfy the rule in <u>McCann</u> even though litigation itself is not one's primary trade.

(Emphasis in original.). <u>Id</u>., *10.

In this case, the claims against O&G arise out of litigation activity that relates directly to O&G's primary trade, i.e., construction. Consequently, North River's CUTPA claim against O&G is proper and valid.

Accordingly based on the law cited above, it would not be appropriate to assess sanctions against North River. Based on the legal arguments above, a Court could not find that North River's claims against O&G are "utterly lacking in support." North River has reasonable arguments and facts to back up why each of its claims against O&G are viable.

## V.   <u>CONCLUSION</u>

WHEREFORE, based on the foregoing, O&G's Motion for Sanctions Pursuant to Rule 11 of the

Federal Rules of Civil Procedure, should be denied.

THE NORTH RIVER INSURANCE COMPANY

BY /s/ R. Cornelius Danaher, Jr.
    R. Cornelius Danaher, Jr. (ct5350)
    Calum B. Anderson (ct07611)
    DANAHERLAGNESE, PC
    21 Oak Street
    Hartford, CT  06106

## CERTIFICATION

This is to certify that on the above date, a copy of the foregoing was filed electronically and served by mail to anyone unable to accept electronic filing.  Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ R. Cornelius Danaher, Jr.
R. Cornelius Danaher, Jr. (ct5350)